DUNDEE CITRUS GROWERS ASSOCIATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dundee Citrus Growers Ass'n v. Commissioner
Docket No. 28006-88
United States Tax Court
T.C. Memo 1991-487; 1991 Tax Ct. Memo LEXIS 536; 62 T.C.M. (CCH) 879; T.C.M. (RIA) 91487; September 30, 1991, Filed *536 Decision will be entered for the petitioner. Donald E. Graham, for the petitioner. Mike E. Jorgensen, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's Federal income taxes as follows: Tax Year Ending
Deficiency
08/31/1985
$ 28,766
08/31/1986
27,486
The sole issue for decision is whether interest earned by petitioner from its cash surplus constituted "patronage-sourced" income within the meaning of subchapter T. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts together with attached exhibits are incorporated herein by this reference. Petitioner's principal place of business is in Dundee, Florida. Petitioner is a cooperative for citrus growers which provides the following services to its members: harvesting, hauling, grading, packaging, *537 and marketing. In turn, petitioner holds title to the citrus fruit on its members' trees and controls the fruit from harvesting through marketing. Petitioner consisted of 57 members and 67 members in tax years 1985 and 1986, respectively. During tax year 1985, 73.8 percent of the citrus fruit handled by petitioner was grown by member patrons; the percentage decreased slightly to 73.1 during tax year 1986. Petitioner's members grow many types of citrus, each with its own growing season. Citrus fruit can be stored on the tree, which is a great advantage due to the volatile market for fresh citrus fruit and because it allows petitioner some control on the supply side of the market. The disadvantage is the risk that a freeze or other natural occurrence will damage the fruit on the trees. Because the market is volatile and petitioner is responsible for many growers, individual growers want petitioner to harvest their fruit when the price is high and to harvest other members' fruit when the price is low. To eliminate this problem, petitioner uses a pooling system which equitably distributes the proceeds from members' fruit. Equal distribution of the proceeds is accomplished by *538 establishing an average price for the type of fruit in a pool for an entire growing season. Generally, the early season fruit has a higher return than the later season fruit. In turn, if a running average price were tracked, it would normally decrease with the passage of time. A danger for cooperatives using a pooling method is that the cooperative may pay out too much during a pool's season based on inaccurate predictions of the average price. To the extent a normal season exists in the citrus industry, the following represents the normal season for some of petitioner's pools: Variety
White grapefruit
September
through
July
Navel oranges
November
through
January
Temple oranges
January
through
March
Dancy tangerines
November
through
January
Sunburst tangerines
December
through
February
Robinson tangerines
October
through
November
Honey tangerines
February
through
April
Valencia
March
through
July
Like Variety
Pink and red seedless
September
through
July
grapefruit, pink
seeded grapefruit
Seeded oranges:
pineapples queen's,
parsons brown's
December
through
February
Tangelos: orlandos,
nova's Kay Early
November
through
January
During 1984 and 1985 petitioner began packing *539 citrus fruit in late September. However, petitioner did not pack a significant amount of fruit until late October and the peak packing periods occurred in November and December of 1984 and 1985, respectively. Petitioner establishes seasonal pools for its members' fruit to be sold as fresh fruit, and cannery pools for all remaining fruit. During the 1984-85 citrus season petitioner established 16 fresh pools and 4 cannery pools, and 14 fresh pools and 5 cannery pools during the 1985-86 citrus season. A pool "opens" from the time of the first harvest of the type of pooled fruit and "closes" when all the fruit that constitutes a pool has been harvested, packed, marketed, sold; all the accounts have been paid; and all expenses and claims deducted. Two to three weeks after a pool is closed, the pool is "settled" by averaging the net proceeds received during the entire season and distributing them based on the average price. Petitioner settled its fresh fruit pools [2] as follows: Pool
84-85 Season Settlements
85-86 Season Settlements
Robinson tangerines
01/03/85
$ 22,408.34
12/31/85
$ 70,646.87
Oscedia citrus
01/23/85
305,218.93
01/16/86
124,963.01
Lee citrus
02/05/85
137,924.59
02/06/86
80,533.08
Navel oranges
02/12/85
71,176.93
02/06/86
85,897.92
Orlando tangelos
02/19/85
382,367.89
02/24/86
251,953.88
Seedless oranges
02/19/85
663,505.01
02/25/86
445,055.97
Dancy tangerines
03/01/85
513,722.31
02/24/86
433,698.66
Marsh grapefruit
03/08/85
66,731.73
02/28/86
54,873.84
Red & pink grapefruit
03/19/85
128,094.88
02/24/86
88,521.37
Seeded oranges
03/25/85
278,229.07
03/21/86
165,392.96
Honey tangerines
04/08/85
33,164.24
04/10/86
154,963.77
Temple oranges
04/08/85
141,207.29
Valencias
07/08/85
1,076,598.70
06/30/86
483,216.05
*540 Under petitioner's pooling system a preclosing distribution is impossible because the average price is not calculated until a pool is closed. Preclosing pool distributions based on estimated average prices never occur. If a member needs money before a pool is settled, petitioner advances funds to the member who pays interest thereon. Members do not have the right to demand a distribution of any excess funds prior to the settlement of a pool. Because nonmembers did not take part in the season-long averaging of proceeds, petitioner established limited pools based on either a nonmember's block number or a variety of fruit. During the 1984-85 season petitioner established 123 fresh pools for nonmembers, and 112 fresh pools during the 1985-86 season. Petitioner did not create any cannery pools for nonmembers during either the 1984-85 or 1985-86 season. As soon as a nonmember's *541 fruit in a pool was sold, the nonmember received money based on the actual sales price received by its fruit, as opposed to the season-long average price petitioner used to pay its members. Besides not being able to take advantage of price averaging, nonmembers would receive secondary treatment in the event of a freeze or similar occurrence. The harvested fruit is marketed by petitioner in one of two ways. A portion of the highest quality fruit is sold to another cooperative, Seald Sweet Growers, Inc. (Seald Sweet), of which petitioner is a member-owner. Seald Sweet then sells the fruit to retailers who sell it as fresh fruit. Seald Sweet usually pays petitioner between 21 and 45 days after petitioner ships the fruit. Throughout the entire season petitioner constantly incurs costs to harvest the fresh fruit. When the Seald Sweet payments exceed the current expenses associated with the fresh pools, petitioner usually loans the excess funds to another cooperative, Citrus World Incorporated (Citrus World) through Citrus World's member reinvestment program (MRP). The interest petitioner earned on its loans to Citrus World's MRP is the first type of interest at issue. Petitioner *542 is one of the 12 member-patrons of Citrus World and during the fiscal years at issue owned approximately $ 1.5 million equity interest in Citrus World, equaling approximately 9.5 percent of Citrus World's total equity. During the years at issue, approximately 8 percent of all citrus fruit that Citrus World processed was supplied by members of petitioner. The MRP provides an informal method for Citrus World to acquire short-term funds to pay the current costs of running its operations. Citrus World decreased its borrowings from the Columbia Bank for Cooperatives by the amount available through its MRP. Citrus World's loans from its members equaled $ 1,924,100 of its $ 81,484,003 total current liabilities in Citrus World's tax year 1986, and the loans equaled $ 2,772,432 of Citrus World's $ 49,451,423 total current liabilities in Citrus World's tax year 1985. The MRP loans did not require the execution of an agreement or other instrument, the purchase of document stamps, any security, nor the involvement of attorneys and the accompanying legal fees. Citrus World's MRP provides a rate of interest greater than or equal to the going commercial rate, which was a factor petitioner *543 considered when determining whether to place funds in the MRP. Funds loaned to the MRP were immediately recallable without any penalty, and the Citrus World services provided to petitioner were in no way contingent on participation in the MRP. Accordingly, all Citrus World members benefit from the MRP whether they participate or not. The overall cost to Citrus World would have increased slightly without participation in the MRP, which in turn would lead to a small decrease in Citrus World's returns to its members. During the years in issue, 9 of the 12 members of Citrus World participated in the MRP. During tax years 1985 and 1986 petitioner's MRP account activity was as follows: MRP
Description of
Date
Activity
Amount
Balance
Withdrawals
08/31/84
Opening Balance
$ 250,000
10/05/84
Withdrawal
($ 100,000)
150,000
Patronage
Dividend
12/27/84
Loan
250,000
400,000
01/14/85
Loan
800,000
1,200,000
01/31/85
Loan
600,000
1,800,000
03/06/85
Withdrawal
(100,000)
1,700,000
Fresh Fruit Pool
Settlements
03/29/85
Withdrawal
(100,000)
1,600,000
Fresh Fruit Pool
Settlements
04/09/85
Withdrawal
(200,000)
1,400,000
Fresh Fruit Pool
Settlements
07/11/85
Withdrawal
(600,000)
800,000
Pool Settlements
08/31/85
Opening Balance
800,000
10/08/85
Withdrawal
(200,000)
600,000
Operating Expenses or
Patronage Dividend
10/30/85
Withdrawal
(300,000)
300,000
Operating Expenses
01/16/86
Loan
700,000
1,000,000
07/09/86
Withdrawal
(100,000)
900,000
Fresh Fruit Pool
Settlements &
Operating Expenses
07/29/86
Withdrawal
(100,000)
800,000
Fresh Fruit Pool
Settlements &
Operating Expenses
08/11/86
Withdrawal
(50,000)
750,000
Fresh Fruit Pool
Settlements &
Operating Expenses
08/26/86
Withdrawal
(150,000)
600,000
Pool Settlements
08/26/86
Loan
50,000
650,000
*544 The fruit that is not sold to Seald Sweet is sold to Citrus World, which markets the fruit as citrus products and byproducts. From November to July during each tax year in issue, Citrus World paid petitioner an advance allowance to cover harvesting and hauling expenses. Petitioner deposited these funds in an interest-bearing money market account which automatically covered all checks drawn on another related non-interest-bearing checking account from which petitioner paid its operating expenses throughout the season. As the incoming advance allowances exceeded petitioner's operating costs throughout the season, the excess funds earned interest. The interest petitioner earned from the interest-bearing money market account is the second type of interest at issue in this case. Each July petitioner paid out the unused portion of the advance allowance and the interest earned on it to its member patrons. Based on petitioner's past experience, absent a freeze or unforeseen contingency petitioner usually had enough excess funds to cover its operations for the entire season by November. Aside from the advance allowances, Citrus World settled the preceding season's canning pools with *545 petitioner once Citrus World sold 75 percent of its inventory with respect to a pool. The 75-percent figure is the result of an agreement between Citrus World and the Columbia Bank for Cooperatives. Petitioner usually received payments from Citrus World in September, October, December, and February of the year following Citrus World's receipt of the fruit. It was not unusual for Citrus World to pay the final settlement for citrus fruit received from its members up to 18 months after receipt and processing of the fruit. Petitioner received the final payment for its 1984-85 citrus fruit sold to Citrus World for processing on February 1986. Likewise, the final payment for the 1985-86 fruit occurred in February 1987. Upon receiving these settlements, petitioner immediately remitted them to its members. During tax years 1985 and 1986, petitioner was in a strong financial position, with no short-term debt, no lack of operating capital, substantially more equity than debt, and a $ 1 million line of credit with Columbia Bank for Cooperatives. In tax year 1985, petitioner's margin before income taxes equaled $ 369,293 and the total interest income earned from Citrus World's MRP and *546 the money market account equaled $ 90,752. Accordingly, the interest at issue comprised 25 percent of petitioner's margin before income taxes. In tax year 1986, petitioner's margin before income taxes equaled $ 202,532 and the total interest income earned from Citrus World's MRP and the money market account equaled $ 86,206. Accordingly, the interest income at issue comprised 43 percent of petitioner's margin before income taxes. See appendix. The Florida citrus industry experienced six crop-damaging freezes between 1980 and 1989. In the event of a freeze, the fruit must be harvested as quickly as possible in order to save as much fruit as possible; nevertheless, a disproportionately large amount of fruit is not suitable for sale as fresh in a freeze year, and must be marketed as citrus products and byproducts. A freeze could affect petitioner's operations as follows: (1) idle costs and downtime necessary to assess the freeze and allow the Government to evaluate the damage; (2) emergency harvest costs to get as much fruit to Citrus World as quickly as possible; and (3) the shutting down of the packing house. Accordingly, the threat of a freeze makes liquidity very important *547 to citrus grower cooperatives. A freeze occurred in January 1986, but petitioner did not have to institute emergency measures or withdraw any funds from either the money market account or the MRP account. OPINION Petitioner characterized the interest income earned from the MRP and the money market account as patronage dividends and deducted it from its gross income. Respondent disallowed petitioner's deductions for the patronage dividends derived from the interest income. The question we must decide is whether interest income earned by petitioner from participation in Citrus World's MRP and the money market account [3] was derived from patronage sources within the meaning of subchapter T of the Internal Revenue Code. Specifically, was the interest income derived by petitioner from "business done with or for [its] patrons," within the meaning of section 1388(a)(1)? Petitioner is a nonexempt *548 cooperative within the meaning of section 1381(a)(2). Such cooperatives are generally taxed in the same manner as corporations, with the exception of the availability of additional deductions such as the deduction for patronage dividends provided in section 1382(b)(1), which states: SEC. 1382(b). Patronage Dividends and Per-Unit Retain Allocations. -- In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year -- (1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d)) with respect to patronage occurring during such taxable year; Section 1388(a) defines patronage dividends as follows: SEC. 1388(a). Patronage Dividend. -- For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies -- (1) on the basis of quantity or value of business done with or for such *549 patron, (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons. Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.
The Federal Circuit expanded the scope of patronage-sourced income in , revg. . The cooperative in Cotter manufactured, purchased, warehoused, and transported hardware goods for its members. Cotter's business was seasonal in that Cotter made the bulk of its purchases in certain seasons, resulting in a time lag between the purchase of goods and resale to its members. Cotter often had to pay for its purchases before the goods were resold to its members, and *550 accordingly needed to retain liquidity at certain times of the year, which both the Federal Circuit and the Claims Court found "'was an important contributing factor to the successful operation as a cooperative * * *.' ." . Additionally, during various times of the year Cotter experienced working capital deficits and working capital surpluses. Cotter used the short-term surpluses to pay down short-term loans, prepay bills, and buy short-term commercial paper, in this order. The interest income at issue was earned from commercial paper and CD's, with maturity dates of 43 days or less, purchased with temporarily unneeded funds. . The Federal Circuit rejected the Claims Court's application of section 1388 because its narrow analytical focus limited the scope of income-generating transactions and the inquiry regarding the need for the income. . Instead the Federal Circuit held: St. Louis Bank [ cannot be so narrowly read as to limit its application only to banking cooperatives. Allowing the Claims Court's narrow focus, which considers the transaction without regard to *551 the totality of the circumstances, would allow the surgical removal of one of a series of transactions from the economic realities that necessitated it. Consideration of the relatedness of a transaction to a cooperative's function must be undertaken by viewing the business environment to which it is arguably related. The activity producing the income may not be so narrowly defined as to limit it only to its income-generating characteristic when such a characterization is not consistent with the actual activity. [; citations omitted.]
In analyzing Cotter's situation, the Federal Circuit found: "The facts clearly establish that taxpayer must retain large amounts of capital, must retain liquidity, and must borrow money in order to function as a cooperative involved in a seasonal business." . Cotter's purchase of short-term commercial paper with its temporarily excess funds was found to be akin to placing the funds in a bank account. . The Federal Circuit also commented upon the need for the income-producing activity in relation to the cooperative's overall activities. Taken in context, Cotter's activity, if not "necessary" *552 to retain its line of credit, was necessary to maintain its business credibility, and it does not require a hyperactive imagination to suppose what the patrons would think too if they learned of the cooperative's negligent management of their funds. The fact that other, somewhat incredible, alternatives were available, does not necessitate that Cotter act unreasonably to fall within the beneficial scope of Subchapter T. [.]
While holding the interest income was patronage sourced the Federal Circuit, agreeing with the Claims Court, issued a caveat to its opinion that Congress did not intend the phrase "with or for patrons" to be of unlimited scope encompassing all income earned by a cooperative and passed through to its patrons. . In , we defined interest income as being patronage sourced if it is: so closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to "actually facilitate" the accomplishment of the cooperative's *553 business purpose. * * * [.]
On the other hand, interest income is not patronage sourced if it is derived from sources that: have no integral and necessary linkage to the cooperative enterprise, so that it may fairly be said that the income from such activities does nothing more than add to the taxpayer's overall profitability. * * * [.]
We found the interest income earned in , qualified as patronage sourced. The financial needs of the nonexempt grain cooperative in Illinois Grain required daily attention and management in order to meet immediate and large demands. The cooperative needed money to meet margin calls, repay members' notes, satisfy patrons' demands under deferred pricing arrangements, and pay current expenses. Likewise, the cooperative's incoming funds were not entirely predictable due to the high volatility of the grain market and its seasonal nature. We found: "To deal with the volatility that exists in the grain business, a company must build into its financial structure a high degree of flexibility in the form of liquidity in order to fund the changes in its *554 current assets and liabilities." . Additionally, the cooperative was undercapitalized which made it potentially more difficult to operate on a day-to-day basis. The cooperative found itself with excess funds on occasion and, at other times, a cash deficit which required short-term borrowing. The excess funds were placed in extremely short-term debt instruments, mostly overnight or over a weekend. We held: The primary purpose here was not to "invest," but to find a temporary parking place for its [the cooperative's] surplus funds, consistent with safety and prudent money management. * * * Petitioner's actions here were entirely comparable to placing the funds in a bank account. One does not make an "investment" in a bank account.* * * In short, we are convinced that petitioner's money management activities in this case were inseparably intertwined with the overall conduct of its cooperative enterprise, and the interest income which it earned was therefore patronaged-sourced, to the same extent as in the Cotter and St. Louis Bank cases. [.]
In Illinois Grain, we supported the Federal *555 Circuit's opinion in Cotter and reiterated the conceptual framework for the section 1388 "business done with or for patrons" cases. We repeat that every case of this nature must necessarily turn upon its own facts. The same activities which may be directly related to the cooperative enterprise in one case may not be so directly related in another case. It all depends upon the nature of the cooperative effort, and the way the cooperative conducts its business. In the instant case, we do not think petitioner did anything different with respect to managing its short-term funds than any other business enterprise would have done, consistent with skilled professional money management. Respondent would appear to require that petitioner do something less than this in order to secure the benefits of subchapter T. We do not think the law requires this, and commonsense indeed dictates otherwise. * * * [.]
The nonexempt cooperative in , earned interest on two types of excess funds. The first type of interest was earned from the unspent portion of funds borrowed to construct a mechanized food *556 warehouse. We held that it was clear that the funds were needed for use in the main cooperative activity, and were patronage-sourced income. . The second type of interest was earned from excess funds not immediately required for use in the cooperative's business. We stated: The facts establish only that the remainder of the interest at issue was earned from the "short-term" (not otherwise defined) placement of funds not immediately required for use in petitioner's business. They fail to establish that the cash was so closely intertwined with and inseparable from petitioner's main cooperative effort that the interest in question is patronage-sourced. Although we realize that cooperatives such as petitioner need cash to operate, the record in this case does not allow us to determine whether the funds that earned the interest income in issue were needed for use in petitioner's cooperative activity. * * * [; fn. ref. omitted.]
Additionally, we stated that the cooperative "failed to make the extensive showing of specific foreseeable needs *557 for cash that allowed us to determine in , that the interest income at issue in that case was patronage-sourced." . On this background, we will now examine the facts of the present case. We reiterate, the determination of whether interest income is patronage sourced is necessarily fact-intensive. . Petitioner harvests, hauls, grades, packs, and markets its members' fruit on a pooling basis. The absence of preclosing distributions allowed petitioner to accumulate temporary surplus funds to the extent cash coming in from both Citrus World and Seald Sweet exceeded petitioner's operating expenses. Petitioner argues preclosing pool distributions were not made because of the fear that it would distribute excess proceeds based on inaccurate estimates of average pool payout prices. The recoupment of excess proceeds is virtually impossible because growers tend to reinvest the pool payments immediately in their own operations, own operations, and growers contract with petitioner *558 on a yearly basis allowing a grower to use another cooperative rather than receiving less proceeds in the following season to balance out current excess pool payments. Another reason petitioner did not make preclosing pool distributions is because of the difficulty, if not impossibility, of accurately predicting the net proceeds that will be realized from an individual pool when it is finally settled. The seasonal nature of the Florida citrus industry increased the difficulty and uncertainty involved in estimating the amount of fruit a member grower's grove would yield in a particular season and the cost to harvest it. The Florida citrus industry experienced six crop-damaging freezes between 1980 and 1989. During January 1986 a freeze occurred and affected many of petitioner's grower members. Petitioner's financial structure, which included the retention of funds until pool settlements, provided the security necessary to survive and succeed in the volatile Florida citrus market. Accordingly, we conclude petitioner's maintenance of the temporary excess of incoming funds over outgoing expenses is both integral and necessary to petitioner's cooperative functions. Upon examination *559 of all of the facts and circumstances, we conclude petitioner's primary purpose was not to invest the surplus funds but rather to find a temporary parking place consistent with safety and prudent money management. Citrus World's MRP and the money market account allowed petitioner immediate access to the funds. A check could simply be written on the interest-bearing checking account, thereby automatically decreasing the money market account, and a single phone call would result in Citrus World's releasing the funds within an hour. Petitioner's actions were comparable to placing the funds in a bank account. . Moreover, the placement of temporarily excess funds in the MRP is more advantageous than placing the funds in the bank. Petitioner received a rate of interest at least equal to the bank rate, and petitioner's related processing and marketing cooperative, Citrus World, had access to funds without the restrictions imposed under a bank loan agreement. Finally we note that for all the above reasons, it is unreasonable to require petitioner to make preclosing pool distributions in order to qualify the interest income *560 for patronage source treatment. Petitioner is not operating in a vacuum, and the movement of funds through petitioner's MRP and bifurcated money market accounts convinces us that petitioner has not abused the legislative graces provided in sections 1382(b) and 1388(a). The fact that other somewhat incredible alternatives were available, does not necessitate that petitioner act unreasonably to fall within the beneficial scope of subchapter T. . To reflect our findings and conclusions herein, Decision will be entered for the petitioner. APPENDIX Petitioner's statements of net margin for the tax years in issue show the following: Year Ended 08/31/85
Total revenue
$ 10,861,230
Less: distribution to patrons
for fruit handled
7,145,428
Fruit assessments
345,029
Gross operating margin
3,370,773
Less: operating expenses
3,192,359
Operating margin
178,414
Plus: Other income and expenses -- net
190,879
Margin before income taxes
369,293
Year Ended 08/31/86
Total revenue
$ 10,011,857
Less: distribution to patrons
for fruit handled
5,814,152
Fruit assessments
295,804
Gross operating margin
3,901,901
Less: operating expenses
3,912,881
Operating margin (loss)
(10,980)
Plus: other income and expenses -- net
213,512
Margin before income taxes
202,532
*561 Footnotes
1. All statutory references are to the Internal Revenue Code, as amended and in effect for the years in issue.↩
2. We are aware that the number of fresh pools on petitioner's books for the 1985 and 1986 seasons is less than the stipulated number of pools.↩
3. ↩
Source
Year
Amount
Citrus World's MRP
1985
$ 84,497
1986
61,597
Money Market Account
1985
6,255
1986
24,609